496 A.2d 1156

COMMONWEALTH of Pennsylvania

v.

Edward SPENCER, Appellant.

COMMONWEALTH of Pennsylvania

v.

Edward SPENCER, Appellant.

Superior Court of Pennsylvania.

Argued March 13, 1985.

Filed Aug. 2, 1985.

Leonard Tishgart, Philadelphia, for appellant.

Ann C. Lebowitz, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before SPAETH, President Judge, and JOHNSON and SHOYER,* JJ.

SPAETH, President Judge:

This case arises on two appeals. The first appeal, No. 3348 Philadelphia 1983, is an appeal from judgment of sentence imposed after appellant pleaded guilty to charges of robbery, burglary, conspiracy, and possession of an instrument of crime. Appellant argues that in imposing sentence of 35 to 70 years in prison, the sentencing judge abused his discretion. We agree, and vacate the judgment of sentence and remand for resentencing before a different judge. The second appeal, No. 211 Philadelphia 1984, is an appeal from the trial court's order denying appellant's motion to withdraw his guilty plea. We must quash this appeal.

* Honorable Kendall H. SHOYER, Senior Judge of the Court of Common Pleas of Philadelphia County, is sitting by designation.

-1-

We shall start by considering Appeal No. 211 Philadelphia 1984—the appeal from the trial court's order denying appellant's motion to withdraw his guilty plea. For if we were to conclude that the motion should have been granted, we should not reach the issue raised by Appeal No. 3348 Philadelphia 1983—whether in imposing sentence on the plea, the sentencing judge abused his discretion.

In support of Appeal No. 211, appellant particularly relies upon our decision in *Commonwealth v. Williams*, 333 Pa. Super. 77, 481 A.2d 1230 (1984), which he argues is controlling. In *Williams* the assistant district attorney promised, as part of a plea agreement, not to make any sentencing recommendation, but then, at the sentencing proceeding, "pure and simple, he broke his word," *id.*, 333 Pa.Superior Ct. at 81, 481 A.2d 1232, and recommended a sentence of incarceration. The sentencing judge imposed a sentence of incarceration, stating in his opinion, however, that the assistant district attorney's recommendation had not influenced his decision. *Id.*, 333 Pa.Superior Ct. at 83, 481 A.2d at 1234. We accepted this statement, *id.*, but held that even so, the only appropriate remedy for the assistant district attorney's violation of the plea agreement was to permit the defendant to withdraw his plea. We noted that as part of the plea agreement certain charges had been nol prossed, and directed that on remand those charges should be reinstated so that the defendant could "plead anew to all the original charges." *Id.*

In arguing *Williams* to us as controlling, appellant emphasizes the similarity in the facts of *Williams* and this case. The assistant district attorney in *Williams* was the same assistant district attorney who appeared at the sentencing proceeding in this case, and the sentencing judge was also the same. At the sentencing proceeding in this case the assistant district attorney "recommend[ed] a period of incarceration of no less than 35 to 70 years in jail." N.T. 11/17/83, at 17. Appellant's counsel protested that "the notes of the [guilty plea] hearing before Your Honor re-

flects [*sic*] the fact that it was agreed that the Commonwealth would not make any specific recommendation as to any possible sentence." *Id.*, at 18. To this, the assistant district attorney replied: "Your Honor, I have reviewed the notes of testimony in court this morning, and at no place in the notes of testimony that I can find does it indicate that the Commonwealth will not make a recommendation." *Id.* In fact, a review of the notes of testimony of the guilty plea proceeding discloses that when appellant entered his plea, the assistant district attorney then representing the Commonwealth—a different assistant district attorney from the one who appeared at sentencing—had asked appellant, "Do you understand there will be no specific recommendations as to any sentence in this case by the Commonwealth; do you understand that?", to which had appellant replied, "Yes." N.T. 12/3/81, at 24. The sentencing judge stated: "I don't remember whether Mr. McGovern [the assistant district attorney who had appeared at the guilty plea proceeding] said he was going to recommend any specific sentence. I don't believe he did. And I think defense counsel may be right that the recommendation would be that the sentence would be left up to me." N.T. 11/17/83, at 19–20. The judge added: "In any event, counsel for both the Commonwealth and most defense counsel in this City know I don't pay any attention to the Commonwealth's recommendation at any time for any reason. It is my job to do the sentencing, not [District Attorney Edward G.] Rendell's." *Id.*, at 20. The judge then imposed sentence totalling 35 to 70 years in prison, to be served consecutive to a sentence of 10 to 20 years that appellant was serving for homicide. *Id.*, at 28–32. In his opinion in response to appellant's appeal, the judge noted appellant's argument that in recommending a sentence, the assistant district attorney had violated the plea agreement. Slip op. of tr. ct. at 6. Rejecting this argument, the judge stated that "[t]he sentence imposed was that determined solely by this Court." *Id.* at 7.

The Commonwealth acknowledges that *Williams* is similar to this case. It argues, however, that *Williams* was wrongly decided; in its view, the remedy ordered in *Williams* —permitting the guilty plea to be withdrawn—was not appropriate. It argues, therefore, that we certify this case for argument before the court en banc so that *Williams* may be reconsidered.

We have concluded that we may not consider either appellant's argument that *Williams* is controlling, or the Commonwealth's argument that *Williams* was wrongly decided. The reason for this conclusion, as will appear, is that in *Williams* the issue of the effect of the assistant district attorney's conduct was preserved for appellate review, while here it has not been preserved.

As our citations to the notes of testimony have indicated, the guilty plea proceeding was conducted on December 3, 1981, and the sentencing proceeding, on November 17, 1983. On November 25, 1983, appellant filed a timely motion to modify sentence, Pa.R.Crim.P. 1410 (motion to modify sentence shall be filed with sentencing court within 10 days of sentence), which the trial court denied on November 28, 1983. On November 30, 1983, appellant filed a supplemental motion to modify sentence. In response, the trial court signed a rule to show cause why appellant's sentence should not be vacated, and made the rule returnable on January 4, 1984. Attached to the rule to show cause was an order vacating the judgment of sentence; however, the order was not signed by the trial court.

On December 14, 1983, appellant filed an appeal from the judgment of sentence. This was Appeal No. 3384 Philadelphia 1983.

On January 4, 1984,[1] the return date of the rule issued on November 30, 1983, the trial court heard appellant's motion to modify sentence. At the start of the hearing, appellant's counsel handed to the court "a motion to withdraw the guilty plea nunc pro tunc." N.T. 1/4/84, at 2. The motion

---

1. This is the date from the notes of testimony; the copy of the docket entries certified to us gives the date as January 5, 1984.

was apparently not filed with the clerk, and it is not contained in the record transmitted to us. The court accepted the motion, however, and directed appellant to "[p]roceed." *Id.* In the course, and at the conclusion, of the hearing, the court denied both the motion to withdraw the guilty plea, *id.*, at 13, and the motion to modify the sentence, *id.*, at 33. The court then "reimposed" the sentence that had been imposed on November 17, 1983. *Id.* When the assistant district attorney inquired whether sentence had ever been vacated, the court answered: "I think it was. I know there was the Rule to Show Cause and there was an Order to Vacate. I think I signed the original." *Id.*

On January 18, 1984, appellant appealed from the trial court's order denying his motion to withdraw his guilty plea. This was the appeal we are now considering—Appeal No. 211 Philadelphia 1984.

■ If appellant wished to challenge the validity of his guilty plea, he was obliged to file a motion to withdraw the plea within ten days of the sentence. Pa.R.Crim.P. 321. Appellant filed no such motion. Accordingly, he has failed to preserve the argument he now makes to us, *i.e.*, that he should have been permitted to withdraw the plea because the assistant district attorney violated the plea agreement. *Commonwealth v. Lee*, 460 Pa. 324, 333 A.2d 749 (1975). *See also Commonwealth v. Smith*, 322 Pa.Super. 504, 469 A.2d 1104 (1983) (failure to file motion within 10 days of sentence constituted waiver of defendant's right to challenge any defects in the guilty plea colloquy); *Commonwealth v. Green*, 312 Pa.Super. 265, 458 A.2d 951 (1983) (failure to timely file petition to withdraw guilty plea resulted in waiver of right to challenge validity of plea on direct appeal).

■ We have not overlooked the fact that on January 4, 1984, at the hearing on appellant's motion to modify sentence, the trial court permitted appellant to file a motion to withdraw the guilty plea *nunc pro tunc*. We pass by the issue whether we may recognize the motion as in fact filed,

given that it was only handed to the court and not filed with the clerk. *Commonwealth v. Nixon,* 311 Pa.Super. 450, 457 A.2d 972 (1983) (leaving motions in judge's chambers or even handing a copy to the judge in the courtroom does not constitute filing; document must be filed in office of clerk of courts). Assuming that the motion was filed, still, it had no force. When, on December 14, 1983, appellant appealed the judgment of sentence of November 17, 1983, the trial court lost its jurisdiction to proceed further regarding the judgment, Pa.R.A.P. 1701(a), except that the court could on timely motion for reconsideration vacate the sentence within thirty days of its imposition, Pa.R.A.P. 1701(b)(3). The court, however, did not vacate the judgment of sentence; although an order to vacate was attached to the rule to show cause, which was issued on November 30, 1983, the court never signed the order. The court therefore lost its jurisdiction, with the result that its acceptance, on January 4, 1984, of appellant's motion to withdraw his guilty plea *nunc pro tunc,* and its subsequent denial of the motion, were both nullities. *Cf. Commonwealth v. Gordon,* 329 Pa.Super. 42, 477 A.2d 1342 (1984) (trial court lost jurisdiction to modify sentence where appeal taken and sentence not vacated within 30 days); *Commonwealth v. Green, supra* (trial court properly ruled it was without jurisdiction to consider motion to withdraw guilty plea filed three months after sentence and two months after appeal taken). Appellant's appeal from the order denying his motion was therefore equally a nullity, and accordingly, the appeal must be quashed.

### -2-

■ On Appeal No. 3348 Philadelphia 1983, appellant argues that in imposing consecutive sentences totalling 35 to 70 years in prison, the sentencing judge abused his discretion. This issue has been preserved for our review. As we have already noted, the sentence was imposed on November 17, 1983; the motion for reconsideration was timely filed, on November 25; the motion was denied on

November 28; and this appeal from the judgment of sentence was timely filed, on December 17, 1983. These events were in no way affected by the action of the trial court in subsequently "reimposing" the judgment of sentence, on January 4, 1984, for as we have discussed, by then the court had lost its jurisdiction to proceed further regarding the judgment.

-a-

The charges to which appellant pleaded guilty arose from two incidents. The evidence regarding these incidents, as summarized by the assistant district attorney at the guilty plea proceeding, was to the following effect.

One incident occurred on January 5, 1981. Two sisters, Rosemary McNally, aged eight-two, and Frances McNally, aged seventy-nine, were in their home at 5800 Greene Street, Philadelphia. With them was Sarah Kelly, aged seventy-seven, who was a nurse attending Frances McNally, and Roberta O'Donnell, aged seventy-five. N.T. 12/3/81, at 35. When Sarah Kelly went to the kitchen, she found appellant and one Robert Green there. Appellant and Green sprayed the women's faces with mace, and tied them up in chairs. Frances McNally begged not to be tied up "because she had just had a stroke and because she was a bleeder. And they made a remark that sounded like go ahead and bleed." *Id.*, at 38. Rosemary McNally was bruised on her ankles and wrists, and Frances McNally was badly bruised on her legs. *Id.*, at 38–39. After tying the women up, and gagging them, except for Roberta O'Donnell, appellant and Green took the women's watches and Sarah Kelly's diamond earrings. They then ransacked the house, and left with the Sterling silverware. *Id.*, at 31–39.

The other incident occurred on January 29, 1981. Alice Martindell, aged sixty-five, was home with her husband, George, at 424 E. Chelten Avenue, Philadelphia. N.T. 12/3/81, at 27. When they answered the door, appellant and Robert Green sprayed mace in their eyes, rushed in, tied them up with lamp cords, taped their mouths and

blindfolded them. *Id.,* at 27–28. They then ransacked the house, upstairs and downstairs, and left, taking some $800 in cash, Mrs. Martindell's jewelry, worth some $2,000, and Mr. Martindell's watch. *Id.,* at 28, 34–35. During the incident, Mr. Martindell was kicked in the groin, and afterwards, he and Mrs. Martindell were taken to the hospital and released. *Id.,* at 28–29.

After the Commonwealth's summary of the evidence, the trial court asked appellant's counsel whether he "wish[ed] to contest any of the facts offered by the Commonwealth to make out the charges," and counsel replied that he did not. N.T. 12/3/81, at 43.

### -b-

As we have indicated, appellant's guilty plea was entered in accordance with a plea agreement. This agreement was stated during the guilty plea hearing and in the plea colloquy, the completeness of which is not questioned by appellant.

Appellant agreed to plead guilty to five bills arising out of the burglary of the McNally home, and to three bills arising out of the burglary of the Martindell home: Bill 1344 (robbery of Sarah Kelly); Bill 1345 (criminal conspiracy); Bill 1346 (possession of an instrument of crime generally); Bill 1356 (burglary, and related charges); and Bill 1357 (robbery of Rosemary McNally) (these bills were all as of the March Term 1981); Bill 1472 (robbery of Mrs. Martindell); Bill 1473 (burglary, and related charges); and Bill 1478 (robbery of Mr. Martindell) (these bills were all as of the April Term 1981). N.T. 12/3/81, at 2–3, 11–13. Appellant also agreed to testify against Robert Green. *Id.,* at 14. Green was an adult; appellant was a juvenile who had been certified to be tried as an adult. *Id.,* at 25–26. Green and appellant were codefendants on the charges arising out of the McNally and Martindell burglaries, and also, on a charge of homicide. *Id.,* at 25; *and see* N.T. 11/17/83, at 2–5. Appellant had already been sentenced on the homicide

charge to ten to twenty years in prison. N.T. 12/3/81, at 19.[2]

On its part, the Commonwealth agreed that at the sentencing hearing, it would advise the sentencing judge whether appellant had testified against Green, *id.;* would recommend that the sentences imposed on the Martindell bills be concurrent with the sentences imposed on the McNally bills, but otherwise would "[make] no specific recommendations as to any sentence," *id.,* at 3–4, 24; and would move to nol pros the remaining charges, *id.,* at 4. These remaining charges arose out of the McNally burglary, and were stated in two bills charging burglary, one bill charging robbery, and fifteen other bills, charging, variously, criminal trespass and defiant trespass, criminal conspiracy, simple and aggravated assault, and recklessly endangering a person and terroristic threats.

Finally, it should be noted regarding the plea agreement that appellant was advised of the permissible range of the sentences that could be imposed on the bills to which he was pleading guilty, and acknowledged that the trial court could impose those sentences to be served consecutively to each other, and also, to the sentence he had received on the homicide charge. N.T. 12/3/81, at 11–13, 18–19.

-c-

At the sentencing hearing, counsel for appellant argued for sentences to be served concurrently with the sentence of 10 to 20 years that appellant was then serving for homicide.

Counsel first emphasized appellant's cooperation with the law enforcement authorities. After noting appellant's pleas before the sentencing judge, counsel noted that appellant had also pleaded guilty, before another judge, to homicide of the third degree and robbery, and had received concurrent sentences of 10 to 20 years in prison. N.T. 11/17/83, at 2–3. Counsel advised the sentencing judge that, as promised at the guilty plea proceeding, appellant had testi-

---

**2.** The record discloses that the homicide charge arose out of the death of one of the persons robbed in the McNally home. *See* N.T. 11/17/83, at 28.

fied against Robert Green on the homicide charge, and that as a result, Green had been found guilty of homicide of the second degree, and other charges, and had received a life sentence. *Id.*, at 22. Counsel stated, moreover, that Green had pleaded guilty to the homicide but had "then retracted his guilty plea knowing the only testimony that there was or the only evidence against him would be [appellant's] testimony," *id.*, at 5, and that despite threats to his life "by people close to" Green, appellant had testified, *id.*, at 6. Counsel also stated that appellant had testified against Green in the McNally and Martindell cases, *id.*, at 22, but he did not state, and the record does not disclose, the outcome of those cases.

Counsel next argued appellant's individual characteristics. He stated that when two months old, appellant had been abandoned by his natural parents and had been raised by one Kathie Gillette as "his natural guardian." *Id.*, at 6–7. Counsel suggested that for lack of a "father figure," appellant, who was 16 years old at the time of the McNally and Martindell incidents, had come under the bad influence of, and "was easily led" by, Green. *Id.*, at 6–8. Referring to the pre-sentence and psychiatric reports, counsel noted that appellant suffered from a speech impediment, had attended "therapy" and retarded-educable classes, and in 1980 could read only at the fifth grade level. *Id.*, at 7–8. Counsel stated that the investigator from the Probation Department—who was not present at the hearing—had stated that "he would not recommend any additional time [*i.e.*, additional to the sentence appellant had received for homicide]." *Id.*, at 8. Counsel concluded by requesting that "any time [imposed] run concurrently with the time" appellant was then serving. *Id.*, at 11.

The assistant district attorney confirmed that appellant "did in fact cooperate with the District Attorney's Office by way of offering testimony against Mr. Green, the codefendant in the case." *Id.*, at 12. The assistant district attorney then argued that this case was "the classic example of a juvenile career criminal gone wild." *Id.* He noted

that appellant had been first arrested at age 13. He added that these arrests had not resulted in adjudications, but noted that at ages 15 and 16 appellant had been adjudicated on four occasions, once for theft, twice for burglary, and once for attempted burglary. *Id.,* at 12–13. The assistant district attorney stated that appellant had "violated each probation he was put on" and "had infractions at all of the correctional schools, the delinquency schools that he was sent to as a juvenile." *Id.* He then discussed the facts underlying the several charges, concluding with the statement that "[t]his is a prime example of a case where the Commonwealth feels that the absolute maximum sentence in this case should be applied. The Commonwealth would recommend a period of incarceration of no less than 35 to 70 years in jail. If you add the PIC [possession of an instrument of crime] conspiracy, which is an inchoate crime, it would be 37½ to 75." *Id.,* at 17.[3]

After some argument regarding the propriety of the assistant district attorney recommending a sentence—which we have referred to in the preceding portion of this opinion—the sentencing judge asked whether appellant had anything to say. *Id.,* at 20. Appellant briefly stated that he was sorry for what he had done, and that he was trying to get the equivalent of a high school diploma while at Camp Hill. *Id.,* at 20–21.

The sentencing judge then proceeded to the imposition of sentence. He opened by stating that he had reviewed the presentence report and mental evaluation of appellant, and had taken into consideration the statements by appellant's counsel and the assistant district attorney. The judge then said:

I might add for the record that this case probably troubled me more than any other case that I have seen in my

---

**3.** Despite the assistant district attorney's assertions, appellant could not have been sentenced for both conspiracy and possessing instruments of a crime. 18 Pa.C.S. § 906. *See Commonwealth v. Gonzales,* 297 Pa.Super. 66, 443 A.2d 301 (1982); *Commonwealth v. Tingle,* 275 Pa.Super. 489, 419 A.2d 6 (1980).

six years on the bench, and I have been in effect waiting for this day.

*Id.,* at 21–22.

After inquiring about and being advised of the life sentence imposed on Green, the sentencing judge recited the components that must be considered in determining sentence: "the protection of society, the gravity of the offense, and the rehabilitative needs of the defendant." *Id.,* at 23. *And see* 42 Pa.C.S. § 9721(b). Next the judge identified the factors weighing in favor of probation, *see* 42 Pa.C.S. § 9722, and in succession, rejected each as inapplicable to appellant. *Id.,* at 23–27. The judge then stated:

Defense counsel has presented what he thinks I should do in this particular case. But after reviewing in detail the facts concerning this crime, once again stating that it is one of the most despicable crimes I have seen in six years on the bench, I feel that the defendant as a result of his activity has forfeited his right to exist in this community, on the street at least, and that the elderly of this City must be protected from animals such as this. And I shouldn't use the term "animals" because, as I have said, it denigrates the animal kingdom when referring to people like this.

If there was ever a case where the death penalty should be imposed, I would gladly pull the switch on you, Chief. I can't think of anything worse that you could do to human beings than what you did to these elderly people. And you consistently did it. You went back and went back. It wasn't an isolated instance. You took advantage of people on their death beds. I think the youngest victim was 79. The oldest was 89, who subsequently died as a result of your activity. But that's not the case before me. That's just another one of your little asides.

Elderly people in this City must be protected from animals like you. When you get out of prison, you are going to be part of that elderly, I hope anyhow.

*Id.,* at 27–28.

Following this statement, the sentencing judge imposed consecutive sentences on the McNally bills, totalling 35 to 70 years; on one Martindell bill, he suspended sentence; on the other two, he imposed sentences of 10 to 20 years, to be served concurrently with the sentences imposed on the McNally bills. *Id.*, at 28–30. Appellant's counsel reviewed the sentences, *id.*, at 30–32, after which appellant was advised of his appellate rights, *id.*, at 32–35. The proceeding then concluded:

> MR. KOLANSKY [the assistant district attorney]: Do you understand everything I have said?
>
> THE DEFENDANT: Yeah.
>
> MR. KOLANSKY: Do you have any questions.
>
> THE DEFENDANT: Are you sure you got the right case?
>
> THE COURT: Yes, I've got the right case, you. It's about time you juveniles find out this courtroom isn't Boys' Town and I am not Pat O'Brien. You want to play in the big leagues, Punk, you pay the price. Get him out of here.
>
> MR. KOLANSKY: Move to nol-pros all remaining Bills.
>
> THE COURT: So moved.

*Id.*, at 35–36.

### -d-

■■■ The imposition of sentence is within the sound discretion of the sentencing judge. *Commonwealth v. Jackson*, 336 Pa.Super. 609, 486 A.2d 431 (1984). The judge's "determination must not be disturbed absent a manifest abuse of discretion." *Commonwealth v. Edrington*, 490 Pa. 251, 255, 416 A.2d 455, 457 (1980). An "abuse of discretion," for sentencing as for other purposes, is defined as

> not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or illwill, as shown by the evidence or the record, discretion is abused.

*Commonwealth v. Jackson, supra,* 336 Pa.Super. at 627, 486 A.2d at 441 (quoting prior cases).

This definition is consistent, and may be compared, with the Code of Judicial Conduct, which provides:

> A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
>
> Canon 2(A).
>
> A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:
>
> (a) he has a personal bias or prejudice concerning a party,
>
> . . . .
>
> Canon 3(C)(1).

 In the present case the record demonstrates that the sentence was the result of the sentencing judge's personal prejudice, bias, and ill-will towards appellant. Accordingly, the judge abused his discretion, and the sentence must be vacated.

The sentencing judge indicated his attitude towards appellant from the outset: "I have been in effect waiting for this day." N.T. 11/17/83, at 22. Although the judge inquired regarding the sentence imposed on Robert Green, he at no point acknowledged that appellant had by pleading guilty accepted responsibility for his part in the crimes committed in the McNally and Martindell incidents, and had by his testimony enabled the Commonwealth to bring Green to justice. Nor did the judge acknowledge any difference between appellant as a sixteen year old boy and Green as an adult. To the contrary, the judge was apparently of the view that appellant was at least as culpable, if not more culpable, than Green. The judge knew that Green had received a life sentence for the death of one of the victims in the McNally incident. *Id.,* at 28. Yet he advised appellant that "[i]f there was ever a case where the death penalty should be imposed, I would gladly pull the switch on you, Chief." *Id.,* at 27.

The sentencing judge's reference to appellant as "Chief" was not the only indication of the judge's attitude. At the end of the sentencing proceeding, he told appellant, "You want to play in the big leagues, Punk, you pay the price." *Id.*, at 36. Most revealing, however, were the judge's repeated references to appellant as an "animal." The first reference was: "[T]he elderly of this City must be protected from animals such as this. And I shouldn't use the term 'animals' because, as I have said [the record does not disclose when this prior statement was made], it denigrates the animal kingdom when referring to people like this." *Id.*, at 27. A moment later the judge repeated the reference, stating to appellant: "Elderly people must be protected from animals like you. When you get out of prison, you are going to be part of that elderly, I hope anyhow." *Id.*, at 28.

Without question, appellant's crimes were major crimes: they were greedy—property of considerable value was taken; they were inflicted on elderly, helpless people; and they were inflicted wantonly, with no thought of, or with indifference to, the possible consequences of spraying mace in the victims' eyes and tying them up. Equally without question, appellant's crimes required that he be imprisoned, and for a substantial period, not only because of the injuries he had done, but to prevent him from injuring more people. But appellant was not an animal. He was a sixteen year old boy—a boy, moreover, who had grown up without parents, ignorant, and deprived of the blessings that so many of us have enjoyed, not because we deserve them but because we have been lucky.

In regarding appellant, and in addressing him, as an animal, the sentencing judge violated the most fundamental premise of our law—that all persons are to be treated equally. That does not mean that some persons will not be punished for having violated the law. As Professor Berman has written, in describing the formation of our legal tradition:

> The Western law of crimes emerged from a belief that justice in and of itself, justice *an sich,* requires that a violation of law be paid for by a penalty, and that the penalty should be appropriate to the violation. The system of various prices to be paid for various violations— which exists in all societies—was thought to justify itself; it was justice—it was the very justice of God. This idea was reflected not only in criminal law but in all branches of the new canon law from the twelfth century on, and it was reflected more and more in the various branches of the new secular legal systems that began to develop contemporaneously. Contracts, it was said, must be legal, and if they were not, a price must be paid for their breach. Torts must be remedied by damages equivalent to the injury. Property rights must be restored by those who have violated them.
>
> H. Berman, Law & Revolution: The Formation of the Western Legal Tradition 194 (1983).

But no one is punished as an animal is punished. The law treats all persons as morally equally—not as equally *good,* but as equally *responsible* for their wrongs. Nor is this principle distinctive to the law. It is also embodied in the injunction, "He that is without sin among you, let him cast a stone at her." John 8:7. None of us is without sin; and all of us may atone for our sin.

-e-

█ Not only must the judgment of sentence be vacated, but the resentencing must be by a different judge. In *Commonwealth v. Darush,* 501 Pa. 15, 459 A.2d 727 (1983), resentencing before a different judge was ordered when the sentencing judge could not admit or deny the remark that "[w]e want to get people like him [the defendant] out of Potter County." The order was required to assure determination of sentence "without a hint of animosity toward [the defendant]." *Id.,* 501 Pa. at 24, 459 A.2d at 732. And in *Commonwealth v. Knighton,* 490 Pa. 16, 415 A.2d 9 (1980), resentencing before a different judge was ordered where the sentencing judge had admitted bias and referred to the

defendant as "scum." *See also Commonwealth v. Sypin,* 341 Pa.Super. 506, 491 A.2d 1371 (1985) (remanded for resentencing before different judge where sentencing judge's statements revealed consideration of uncharged crimes, raising reasonable question about judge's impartiality); *Commonwealth v. Bryant,* 328 Pa.Super. 1, 476 A.2d 422 (1984) (remanded for resentencing before different judge where sentencing judge's *in camera* remarks in prior case showed predetermination to impose maximum sentence); *Commonwealth v. Schwartz,* 267 Pa.Super. 170, 406 A.2d 573 (1979) (remanded for resentencing with order that resentencing before different judge should be considered if judge had seen television show about defendant; if judge did see show, must place on record why his impartiality could not reasonably be called into question).

On Appeal No. 3348 Philadelphia 1983: the judgment of sentence is vacated and the case is remanded for resentencing before a different judge. Jurisdiction is relinquished.

On Appeal No. 211 Philadelphia 1984: the appeal is quashed.

SHOYER, J., files a concurring opinion.

SHOYER, Judge, concurring:

I concur in the result.

This case must go back for resentencing because the Office of the District Attorney broke its commitment not to recommend specifically as to term of sentence. At the time of sentence, in violation of its commitment, the assistant district attorney specifically requested 35 to 70 years, which was the exact sentence subsequently imposed by the court.

Because of the bias and ill will shown by the sentencing judge, the remand must also go to another judge. To address the defendant as "Punk", to call him an "animal", and to observe "If there ever was a case where the death penalty should be imposed, I would gladly pull the switch on you, Chief" is to speak to defendant in a language which he undoubtedly understands. It is the language of the cold,

cruel world in which he has unfortunately lived for 16 years, but when used by the Judiciary, it is degrading and entirely unnecessary. The sentencing judge should appear as the fountainhead of justice, not the spirit of revenge. Let the severity of the sentence speak for itself. No cacophany of phrases is needed.